IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | MAGISTRATE CASE |
| | : | |
| v. | : | |
| | : | |
| | : | NO. 14-MJ-937 |
| RAYMOND LEE SAVILLE | : | |

MEMORANDUM ORDER

This case presents the question whether the government has presented probable cause that the defendant uttered a "true threat." For the following reasons, I conclude that the government has met its probable cause burden.

I.  PROCEDURAL HISTORY

On September 25, 2014, Special Agent Mark Lazarowitz of the Department of Veterans Affairs ("VA") swore out an affidavit in support of a criminal complaint charging Raymond Lee Saville with one count of threatening a United States official in violation of 18 U.S.C. § 115(a)(1)(B). The Honorable David R. Strawbridge approved and issued the complaint the same day. Mr. Saville was arrested and had his initial appearance on September 29, 2014, before the Honorable Henry S. Perkin, and his preliminary hearing was continued. That hearing took place before me on October 21, 2014, after which I took the matter under advisement and afforded counsel time to provide further authority for their respective positions. Counsel have each submitted letter briefs, and the matter is now ripe for disposition.

II.     FACTS

At the hearing, the government called Agent Lazarowitz who adopted his affidavit. The affidavit sets forth the following allegations of fact, all of which occurred in 2014.[1] By way of background, the affidavit states that in attempting to locate Mr. Saville to arrest him on a separate federal complaint pending in this district, Agent Lazarowitz learned that charges were also pending against him in Wilmington, Delaware.[2] Agent Lazarowitz also learned that on or about July 2, police officers in East St. Louis, Illinois, came in contact with Mr. Saville when he said he was lost, and that the officers found a butcher knife under the front seat of Mr. Saville's car as well as evidence related to the Delaware case. After returning to his hotel, Mr. Saville checked himself into the VA Medical Center ("VAMC") in St. Louis, and VA police placed him under arrest based upon the federal warrant. He was turned over to the United States Marshal Service, and following a hearing was ordered transferred to this district where he had his initial appearance on July 9, 2014. On September 9, the Honorable Linda K. Caracappa ordered him released to a shelter for veterans. On September 11, he was transferred to the Coatesville VAMC.

---

[1] The affidavit remains sealed in light of Mr. Saville's psychiatric condition, and I will endeavor to review the allegations with deference to his privacy.

[2] In the federal matter, a complaint in this district (number 14-mj-679) alleged that on June 26, Mr. Saville called an individual and stated that he needed to blow up the VA and that "the Post Office is next." The Delaware charges alleged that on June 23, he attempted to run down two car salesmen in a dealership parking lot after arriving on the lot with signs stating that the dealership was crooked, and that one salesmen was hit by the driver's side door and the other was struck by the hood of the car.

The affidavit goes on to allege that on or about September 22, personnel at the VAMC told Mr. Saville that he was going to be discharged soon and began to discuss his treatment plan. Mr. Saville said to them that he was going to "kill the cop who arrested me. I'm going to kill the Illinois State Trooper or the FBI who stole my identification." These are the words that are alleged to be threatening in this matter.

Agent Lazarowitz testified that the staff at the Coatesville VAMC deemed the threats credible and called the VA police requesting that Mr. Saville be arrested and removed from the center. The date the threats were made was Monday, September 22, and the agents decided not to immediately arrest him but to seek a criminal complaint, which was issued on Thursday, September 25. Agent Lazarowitz testified that the staff continued to believe that the threats were credible and that Mr. Saville should be removed as a threat to patients and staff. The agents did not arrest and remove him until the following Monday, September 29, because they believed it was better for Mr. Saville to remain at the VAMC than in custody. Defense counsel established on cross examination that the unit where Mr. Saville was being treated was a locked psychiatric unit, and that Mr. Saville was "happy" and did not present a problem for the staff until they told him he was going to be discharged. Id. at 44. Additionally, the defense introduced a page of Coatesville VAMC progress notes from the day in question in which Mr. Saville is quoted as saying that he wanted to kill himself as soon as he got out and then made the above-referenced threat.

III.    APPLICABLE LAW

Section 115(a)(1)(B), in relevant part, makes it a crime for anyone who "threatens to . . . murder . . . a Federal law enforcement officer . . . with intent to retaliate against such official . . . on account of the performance of official duties."  The only element in dispute for purposes of probable cause is whether Mr. Saville's words constitute a threat within the meaning of this statute, and specifically whether they qualify as a "true threat" as opposed to speech that is protected by the First Amendment.  The defense argues that Mr. Saville's words should be viewed "in the context of Mr. Saville merely ranting as a patient in a psychiatric unit, and [that] considering the lack of any specificity as to date, time or place, as well as the reaction of those who heard the ranting, it is clear that the ranting did not amount to a serious threat."  The government in contrast asks the court to find that "the context in which the statements were made, the non-conditional nature of the retaliatory statements, and the reaction o[f] the listeners renders Saville's statements 'true threats.'"

This determination is guided by the Supreme Court's decision in Watts v. United States, 394 U.S. 705 (1969), in which the Court distinguished true threats from constitutionally protected speech by considering the context of the speech, the audience, whether the statements were conditional in nature, and the response of the audience.  Id. at 707-08.  In 1991, the Third Circuit relied on Watts in adopting an objective test requiring:

> the defendant intentionally make a statement, written or oral,
> in a context or under such circumstances wherein a
> *reasonable person would foresee that the statement would be*

4

> *interpreted by those to whom the maker communicates the statement as a serious expression of an intention to inflict bodily harm upon or take the life of the President*, and that statement not be the result of mistake, duress or coercion.

United States v. Kosma, 951 F.2d 549, 557 (3d Cir. 1991) (emphasis in original); see also, e.g., United States v. Richards, 271 Fed. Appx. 174 (3d Cir. 2008) (applying Kosma reasonable person test to alleged threat against former president's wife under section 879); United States v. Oakley, Cr. No. 02-123-1, 2003 WL 22425035 (E.D. Pa. May 30, 3002) (applying Watts and Kosma to determine if written communication to judge constituted a true threat under section 115). [3]

The court in Kosma explained that the proscription against making threats is "meant to protect" not only the threatened official's "life, but . . . is also meant to prevent the disruptions and inconveniences which result from the threat itself, regardless of whether there is any intention to execute the threat." 951 F.2d at 556. Likewise, the Supreme Court noted that the prohibition on true threats "protect[s] individuals from the fear of violence" and "from the disruption that fear engenders," and "from the possibility that the threatened violence will occur." R.A.V. v. City of St. Paul, 505 U.S. 377, 388

---

[3]Watts and Kosma involved violations of section 871 (presidential threats), but courts apply the same test to violations of section 115. See United States v. D'Amario, 461 F. Supp.2d 298, 299-300 (D.N.J. 2006) (Diamond, J., sitting by designation) (citing, inter alia, United States v. Martin, 163 F.3d 1212, 1216 (10th Cir. 1998); United States v. Malik, 16 F.2d 45, 49-50 (2d Cir. 1994); United States v. Roberts, 915 F.2d 889, 891 (4th Cir. 1990)).

(1992).  Thus, the speaker's subjective intent to carry out the threat is not an element of the definition of a true threat.[4]

The defense disputes the continued viability of Watts and Kosma in light of the Supreme Court's decision in Virginia v. Black, 538 U.S. 343 (2003), where the Court held that the act of cross-burning by itself was not prima facie evidence of an intent to discriminate.  In language the defense now relies on, the Court wrote, "[t]rue threats encompass those statements where the speaker means to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals."  Id. at 360.

In United States v. Elonis, 730 F.3d 321 (3d Cir. 2013), the Third Circuit rejected a similar argument in the context of a prosecution under 18 USC § 875(c) (interstate transmission of a threat to injure), concluding that Black did not adopt a subjective intent requirement.

> Limiting the definition of true threats to only those statements where the speaker subjectively intended to threaten would fail to protect individuals from "the fear of violence" and the "disruption that fear engenders," because it would protect speech that a reasonable speaker would understand to be threatening.

Id. at 330; see also Martinez, 736 F.3d at 986-87 (joining Fourth, Sixth and Eighth Circuits, and rejecting Ninth Circuit, in concluding that Black did not establish a

---

[4]Courts applying Watts have differed in whether the "reasonable person" is in the position of the person uttering the words versus the person to whom the words are directed.  See generally United States v. Martinez, 736 F.3d 981, 985 (11th Cir. 2013). The challenge raised by the defense here is not directed to the particular definition of the objective test for a true threat, but rather whether the test is still an objective, rather than subjective, one.

6

subjective threat test); D'Amario, 461 F. Supp.2d at 301 (rejecting argument that Black requires intent to carry out threat).  The Supreme Court is poised to resolve the dispute.  On June 16, 2014, the Court granted certiorari in Elonis, to address the question "[w]hether consistent with the First Amendment and Virginia v. Black . . . , conviction of threatening another person requires proof of the defendant's subjective intent to threaten . . . or whether it is enough to show that a "reasonable person" would regard the statement as threatening . . . ."  Elonis v. United States, 134 S. Ct. 2819 (2014) (granting certiorari to address question presented in petition, which can be found at 2014 WL 645438).[5]

In light of the Third Circuit's continued reliance on Watts and Kosma in determining whether there is a true threat, I am bound to do so as well.  Should a decision in Elonis alter the landscape, that change will have to be addressed in the appropriate proceeding at a later date.

IV.    DISCUSSION

Turning to the question at hand, does the evidence establish probable cause that Mr. Saville intentionally made a statement in a context or under such circumstances wherein a reasonable person would foresee that the statement would be interpreted by those to whom he communicated it as a serious expression of an intention to take the life of the officer who arrested him?

---

[5]The case is set for argument before the Supreme Court on Monday, December 1, 2014.  The Court will also address "[w]hether, as a matter of statutory interpretation, conviction of threatening another person under 18 U.S.C. § 875(c) requires proof of the defendant's subjective intent to threaten."  134 S. Ct. 2819.

Certainly, it makes sense to begin with the words themselves.  Although there is evidence that Mr. Saville threatened his own life as well and that he was motivated by a fear of being discharged, there is no doubt that the words he directed at the staff were of a threatening nature and were not conditional – "I'm going to kill the cop who arrested me."  There is no evidence that Mr. Saville was speaking in a joking manner or otherwise indicating that he did not mean what he said.

Beyond the words themselves, it is important to identify and weigh the relevant context and circumstances.  The words were said on the locked unit of a psychiatric hospital by a person who was suffering from psychiatric disturbance, and they were expressed to the staff of that unit who would be aware of his condition.  There is no evidence that the staff was made aware that Mr. Saville was facing criminal charges or the substance of those charges, or that he was found to have a butcher knife in his car, so I will not include these facts in the reasonable person analysis.  The affidavit indicates that Mr. Saville uttered the words in response to being told by staff that he was going to be discharged and in conjunction with a threat to kill himself, which could support an inference that his intent was to avoid discharge and stay in the hospital.  There is no evidence that Mr. Saville was acting in a physically threatening manner, and no direct evidence that he intended to carry out the threat or frighten anyone by the threat.

Without any additional evidence, there is a serious question whether probable cause is made out.  However, there is additional evidence presented in this case, specifically the subjective reaction of the VAMC staff.  Agent Lazarowitz testified that the staff believed the threat was credible, that they were uncomfortable with Mr. Saville

8

remaining at the facility, and that they called law enforcement asking that Mr. Saville be arrested and removed. This evidence is relevant because, although the Kosma objective test focuses on what reaction a reasonable speaker would foresee under the circumstances, courts look to the listener's actual reaction as an important factor in applying the test. Two cases provided helpful input in this regard.

In United States v. Richards, 271 Fed. Appx. 174 (3d Cir. 2008) (not precedential), the defendant was at a shelter when he was overhead making threatening statements about a former president's spouse (Hillary Clinton). Despite actions by workers at the shelter in calling the police and removing him from the meal line, the Third Circuit found that the evidence was insufficient to support the conviction under section 879 applying the Kosma reasonable person test. Id. at 177. Specifically, although a worker notified security, he did so as a matter of procedure. Similarly, although a worker stayed close by when the defendant was being questioned, protocol rather than fear was cited as the reason. And although the evidence showed that other individuals in line moved away from the defendant, this was because he was disheveled and malodorous. There was evidence that one staff member was alarmed by the statements, but that staff member was reacting to the defendant's chanting about white people as opposed to his threatening words about Mrs. Clinton. Finally, the reason the defendant was removed by police from the shelter and taken to a hospital was out of concern for his health and safety as it was cold on the street.

In United States v. D'Amario, Cr. No. 06-112, 2007 WL 928473, at *1 (D.N.J. Mar. 26, 2007), a defendant serving a period of supervised release sent a motion and

memorandum to his sentencing judge asking that his supervised release be revoked and stating that the judge "should heed the warning . . . that Defendant is extremely dangerous. . . .  It is safer to revoke his supervision now . . . than to speculate on how this 'schizophrenic' who passionately hates NJ judges will react to sudden liberty."  In denying the defendant's post-trial motion after being found guilty of threatening the judge under section 115(a)(1)(B), the district court found sufficient evidence that there was a true threat.  The court looked at the threatening language and also considered the judge's familiarity with the defendant's criminal history -- which included violent and weapons offenses and conviction for threatening another federal judge -- and the judge's reaction to the memorandum -- which included contacting the Marshal Service and requesting they conduct a threat assessment, and installing a home security system.  Id. at *4.  Although the defendant argued that he only made the threat so that he would be incarcerated and avoid further supervised release, the court determined that it was for the jury to decide whether there was a true threat.  Id.

     Neither Richards nor D'Amario involved a question of probable cause, but they are nonetheless instructive in focusing on the reaction of the person hearing (or reading) the threats and the reasons for that reaction in applying the reasonable person test.  While there is certainly room for doubt whether a jury would ultimately find that Mr. Saville uttered a true threat, the evidence presented makes out probable cause of such a threat.  The words stated an intention to kill a specific person, and, unlike in Richards, they were taken in context by the VAMC staff to be credible and to necessitate requesting that law enforcement arrest and remove him for patient and staff safety.  It is true that the staff did

not insist that Mr. Saville be removed immediately and that he remained there a full week after the statement was made. However, there is evidence that this was in response to law enforcement's request and to protect Mr. Saville from immediate incarceration. It does not therefore negate the existence of evidence supporting the existence of a true threat.

V.	CONCLUSION

For the foregoing reasons, I find that the government has set forth probable cause that Mr. Saville violated 18 U.S.C. § 115(a)(1)(B).

BY THE COURT:

November 10, 2014              /s/ Elizabeth T. Hey
DATE                           ELIZABETH T. HEY
                               UNITED STATES MAGISTRATE JUDGE